IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| OHIO COUNCIL 8 AMERICAN | : | |
| FEDERATION OF STATE, COUNTY, | : | Case No. 1:10-cv-504 |
| AND MUNICIPAL EMPLOYEES, AFL-CIO, | : | |
| *et al.*, | : | Chief Judge Susan J. Dlott |
| Plaintiffs, | : | |
| | : | ORDER GRANTING DEFENDANT |
| v. | : | OHIO ATTORNEY GENERAL'S |
| | : | MOTION FOR SUMMARY |
| JENNIFER BRUNNER, *et al.*, | : | JUDGMENT |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

Judges are elected in Ohio. Although they run in partisan primaries, judicial candidates'

names are listed in the nonpartisan section of the general election ballot. Ohio Revised Code

("O.R.C.") § 3505.04, "Nonpartisan ballots," prohibits the printing of party identifiers on the

nonpartisan section of the general election ballot. Plaintiffs—comprised of three judicial

candidates, the Ohio Democratic Party on behalf of its registered voters, and a statewide labor

organization on behalf of its members—contend that O.R.C. § 3505.04 violates their rights of

free expression and association under the First Amendment because it prevents judicial

candidates from being identified by their political parties on the general election ballot.

The Ohio Attorney General, who intervened in the lawsuit to defend the statute's

constitutionality on behalf of the State, has moved for summary judgment on Plaintiffs' claims.[1]

---

[1] The Court hereinafter refers to the Ohio Attorney General as "the State" or "Ohio."

He asserts that Ohio's use of a nonpartisan ballot for judicial elections does not encroach on Plaintiffs' First Amendment rights and, even if it did, that the statute survives constitutional scrutiny because it advances Ohio's compelling interest in diminishing reliance on political parties in judicial selection. Doc. 59. For the following reasons, the Court GRANTS the State's motion.

## I.      BACKGROUND

Ohio stands alone in the way it fills vacancies on its state court benches: candidates first compete in a partisan primary and then in a nonpartisan general election. In the primary election, judicial candidates are listed on their political party's primary election ballot. These ballots are referred to as "office type" ballots. O.R.C. § 3505.03. The winners of these partisan primaries go on to have their names listed on the general election ballot, along with the names of any independent judicial candidates. All judicial candidates competing in a general election in Ohio are considered nonpartisan candidates. O.R.C. § 3501.01(J). Pursuant to O.R.C. § 3505.04, the statute Plaintiffs are challenging in this case,

> No name or designation of any political party nor any words, designations, or emblems descriptive of a candidate or his political affiliation, or indicative of the method by which such candidate was nominated or certified, shall be printed under or after any nonpartisan candidate's name which is printed on the ballot.

Based on this statute, no judicial candidate in Ohio may appear on any general election ballot with a party designation near his or her name.

Judicial candidates are the only candidates in Ohio who appear on an office type ballot in the primary election but on a nonpartisan ballot in the general election. Legislative and executive branch candidates who appear on an office type ballot in the primary also appear on an

office type ballot in the general election. According to the State, the purpose of placing judicial candidates on a nonpartisan general election ballot is to "withdraw candidates for judicial offices from partisan politics" because "[i]n his official capacity [the judge] can serve no party, promulgate no partisan theories of government, [and] encourage no partisan economic measures." *State ex rel. Weinberger v. Miller*, 87 Ohio St. 12, 49, 99 N.E. 1078, 1085 (Ohio 1912).

The judicial candidates who are Plaintiffs in this case declared their candidacy for the 2010 election and listed his or her party affiliation as "Democrat." The candidates then ran unopposed in their party's primary election and qualified as candidates for the nonpartisan general election. Because the candidates wanted to include their party affiliation next to their names on the general election ballot, Plaintiffs filed this lawsuit against local boards of elections challenging the constitutionality of O.R.C. § 3505.04 and seeking an injunction to prohibit the statute's enforcement.

At an August 2010 hearing, this Court heard testimony from Plaintiffs and an expert in voting behavior. Following the hearing, the Court issued an order denying Plaintiffs' request for injunctive relief. Doc. 49. Contributing to the Court's decision was the fact that enjoining enforcement of § 3505.04 would have required the State to revise the general election ballot, and the ballot certification date for the 2010 election was less than a week away. In addition, Plaintiffs did not demonstrate any need for expediency. But most important, Plaintiffs did not demonstrate a likelihood of success on the merits. Specifically, Plaintiffs did not "put forth evidence to demonstrate that prohibiting a political party designation next to judicial candidates' names on the general election ballot constitute[d] a 'severe' restriction on Plaintiffs'

constitutional rights." *Id*. at Page ID 798. Accordingly, the burden on the Plaintiffs' rights could be justified by the State's important regulatory interests. *Id*. at Page ID 799 (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 362–63 (1997)).

Plaintiffs appealed the ruling. While the matter was pending before the Sixth Circuit, the State filed the instant Motion for Summary Judgment. Doc. 59. Plaintiffs filed a response in opposition that incorporated by reference the arguments they had made to the Sixth Circuit. Doc. 65. The State then filed a reply, thus completing summary judgment briefing on the issue. Doc. 73. Neither party engaged in the discovery of information during this time but based their briefing on the information presented to the Court during the preliminary injunction hearing.

The Sixth Circuit affirmed this Court's decision denying preliminary injunctive relief to Plaintiffs. It stated, "[w]e agree with the district court that Plaintiffs have not shown a likelihood of success on the merits of their argument that the prohibition of political party designations next to judicial candidates' names burdens their rights to association and free speech and is not outweighed by Ohio's interests." *Ohio Council 8 Am. Fed. of State Cnty. and Mun. Emp. v. Brunner*, 462 F. App'x 557, 559 (6th Cir. 2012). The Sixth Circuit also agreed with this Court's determination that Plaintiffs failed to show irreparable harm, that the balance of equities favored Ohio, and that the public interest weighed in favor of not granting the injunction. *Id*. The court noted that "at the time the district court denied the injunction, it expressed a desire to let the parties engage in discovery and argument on the issue" and observed that "a merits proceeding has not yet been held." *Id*. The Sixth Circuit then remanded the matter to this Court for a final merits determination.

Following the remand, the Court held a status conference with the parties. At that time, Plaintiffs were granted leave to file additional briefing on the State's motion for summary judgment by a certain date. Plaintiffs, while filing additional briefing on a separate issue in the captioned case, did not file additional briefing on the ballot issue that is the subject of the State's Motion for Summary Judgment. At no time did the parties raise any issue of disputed fact related to the challenge to Ohio Revised Code § 3505.04 or conduct discovery. Thus, only a question of law remains: Does Ohio's statutory requirement that judicial candidates run in the general election on a nonpartisan ballot violate Plaintiffs' rights to political expression and association under the First Amendment?

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to

defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The task of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when the evidence is not "so one-sided that one party must prevail as a matter of law." *Id.* at 252.

## III. ANALYSIS

The factual record in this case is the same as it was when this Court denied preliminary injunctive relief to Plaintiffs in an order that was affirmed by the Sixth Circuit. At that time, Plaintiffs failed to establish a strong likelihood of success on the merits of their claims. There have been no changes in applicable law since that ruling, and Plaintiffs' argument is no different than it was then. Accordingly, the Court finds that Ohio's placement of judicial candidates on the nonpartisan section of the general election ballot does not violate Plaintiffs' rights to political expression and association under the First Amendment.

When evaluating a constitutional challenge to a state election law, courts must use a "flexible" balancing approach. *Ohio Council 8*, 462 F. App'x at 559 (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). This approach requires a court to balance the state's precise interests against the rights of the plaintiff. *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick*, 504 U.S. at 434.

Under the *Anderson-Burdick* balancing test, a court must weigh "the character and magnitude of the asserted injury to the rights protected by the First . . . Amendment[]" against "the precise interests put forward by the State as justifications for the burden imposed by its

rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights." *Anderson*, 460 U.S. at 789. Under this test, the rigorousness of a court's inquiry into the propriety of the election law depends on the extent of the burden the law creates. *Burdick*, 504 U.S. at 434. When the law constitutes a "'severe' restriction[], the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). On the other hand, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions'" upon the plaintiffs' First Amendment rights, "'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788).

Under this approach, this Court's first step is to determine the severity of the restriction O.R.C. § 3505.04 places on the speech and association rights of judicial candidates, parties, and voters. *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 585 (6th Cir. 2006). Then, the Court must determine whether the extent of the restriction is justified by Ohio's interest in diminishing reliance on political parties in judicial selection.

### A. Judicial Candidates

Plaintiff judicial candidates contend that prohibiting party labels on the general election ballot denies them, as partisan primary winners, the opportunity to show voters the party with which he or she is affiliated—an important associational interest to the candidates. The candidates also contend that the statute heavily burdens their freedom of speech to express their qualifications and primary victory. While each of the three Plaintiff groups in this case assert that the Ohio statute violates their associational rights guaranteed by the First Amendment, only the judicial candidates assert that the statute also violates their First Amendment right to free

7

expression.[2]  The Court will address the judicial candidates' argument regarding their expressive rights before proceeding to the argument regarding their associational rights.

### 1.      Free Expression

A candidate's freedom to speak about his or her qualifications for an elected position is a core First Amendment right.  *Carey v. Wolnitzek*, 614 F.3d 189, 198 (6th Cir. 2010) (citing *Republican Party of Minn. v. White*, 536 U.S. 765, 774 (2002)).  Plaintiffs assert that party affiliation is an element of a candidate's qualifications and argue that, under *Carey*, Ohio's elimination of a judicial candidate's party affiliation from the general election ballot is a significant burden on the candidate's free speech rights.

The State, in moving for summary judgment, says that Plaintiffs' argument misses the mark.  The issue, it contends, is not whether judicial candidates have a right protected by the First Amendment to speak about his or her qualifications.  Rather, the issue is whether these candidates have a right *to use a general election ballot* as a means of communicating.  According to the State, Plaintiffs do not have that right because the content of a ballot is government speech, and government speech is exempt from First Amendment scrutiny.  *See Pleasant Grove*

---

[2]  Plaintiffs claim in their Complaint that Defendants "have violated rights secured to the Plaintiffs by the First and Fourteenth Amendments to the United States Constitution including the right to free expression, the right of association, the right to due process of law, and the right to equal protection under the law."  Doc. 1 at Page ID 18.  This claim arose out of two distinct factual scenarios: the present issue with respect to the general election ballot, and the separate issue of campaign donation solicitation by judicial candidates.  The campaign solicitation issue was resolved by a prior determination of this Court.  Thus, the only remaining issue is the ballot issue.

Plaintiffs' briefing makes clear that they are pursuing only the First Amendment-based claims of rights to free expression and association with respect to the ballot issue.  Specifically, Plaintiffs argue that the non-partisan ballot burdens the Democratic Party's right of association (*see* Doc. 65-1 at Page ID 916, 921); voters' right of association (*see id.* at Page ID 922); and judicial candidates' rights to free speech and association (*see id.* at Page ID 924 and Doc. 65-2 at Page ID 946).

*City v. Summum*, 555 U.S. 460, 467 (2009) ("The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.").

The law more fully supports the State's reasoning than the Plaintiffs'. "Ballots serve primarily to elect candidates, not as a fora for political expression." *Timmons*, 520 U.S. at 363 (upholding Minnesota's fusion ban and holding that political parties do not have the right to use a ballot to send a message to voters about its support for a candidate). Although *Timmons* addressed whether a *political party* had a right to communicate its choice of nominees on the ballot, not a *candidate's* right to use the ballot to communicate his or her party affiliation, the case makes clear the Supreme Court's view that an election ballot is not a vehicle for sending a private message. *Id*.

Plaintiffs would like the Sixth Circuit's decision in *Carey* to control the outcome in this case. That they would so desire is not surprising: *Carey* sets forth clear principles supporting the First Amendment right of judicial candidates to express their party affiliation. In striking down the clause of Kentucky's Code of Judicial Conduct that prohibited judicial candidates from identifying themselves as a member of a political party in any form of advertising or when speaking to a gathering, *Carey* validated judicial candidates' First Amendment right to "announc[e] their position on one issue of potential importance to voters: the party they support." *Carey*, 614 F.3d at 201. The Sixth Circuit was guided to this conclusion in part by the principle expressed by the Supreme Court in *White* that speech about the qualifications of candidates for public office is "at the core of our First Amendment freedoms." *Id*. at 198 (quoting *White*, 536 U.S. at 774). While *Carey* stopped short of saying that a judicial

candidate's party affiliation is a "qualification," it observed that voters often rely on cues that are even worse indicators of the qualities that make a good judge:

> Voters often resort to a variety of proxies in selecting judges and other office holders, some good, some bad. And while political identification may be an unhelpful way to pick judges, it assuredly beats other grounds, such as the all-too-familiar formula of running candidates with familiar or popular last names.

*Id*. at 203.

Plaintiffs ask this Court to apply *Carey*'s reasoning this case and conclude that, because judicial candidates have a First Amendment right to express their qualifications, they have a First Amendment right to list their party affiliation next to their names on Ohio's general election ballot. However, there is a fundamental difference between *Carey* and this case: ballot content was not an issue in *Carey*. Kentucky's judicial elections are nonpartisan. *Id*. at 194. There is a single primary election for each judicial seat, and the top two vote-getters receive a spot on the general election ballot. Neither the primary ballot nor the general election ballot include any party identifiers. *Id*. Thus, the Sixth Circuit was not called upon to consider the ballot as a forum for the candidates' speech.

Despite this distinction, it is reasonable for Plaintiffs to urge this Court to apply *Carey*'s reasoning to this case because the principles expressed therein are relevant to the issue of placing party identifiers on judicial ballots. Specifically, although *Carey* involved a challenge to Judicial Canons and not ballot language, the Sixth Circuit's discussion in that case underscored the government's interest in transparency with respect to party affiliation in a judicial race:

> If concern over judicial partisanship and the influence of political parties on judging truly underlies the [party affiliation] clause, the authorization to belong (secretly) to a political party amounts to a gaping omission. A party's undisclosed potential influence on

>candidates is far worse than its disclosed influence, as the one
>allows a full airing of the issue before the voters while the other
>helps to shield it from public view.

*Id*. at 202.

Indeed, if this were a policy question and not a legal one, it would be simple to find in Plaintiffs' favor by melding the reasoning of *Carey* with the body of Supreme Court election law that has yielded the following axioms: "'The role that elected officials play in our society makes it all the more imperative that they be allowed freely to express themselves on matters of current public importance'" (*White*, 536 U.S. at 781–81 (quoting *Wood v. Georgia*, 370 U.S. 375, 395 (1962)); "There can be no question about the legitimacy of [a] State's interest in fostering informed and educated expressions of the popular will in a general election" (*Anderson*, 460 U.S. at 796); and, the ballot has a "special role" in elections because it is "the last thing the voter sees before he makes his choice" (*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 460 (2008) (C.J. Roberts, concurring) (internal quotations omitted). These decisions indicate that disclosure of a judicial candidate's party affiliation on the general election ballot is the most effective means of "'communicating relevant information to voters'" and allowing "a full airing of the issue before the voters." *Carey*, 614 F.3d at 202 (quoting *White*, 536 U.S. at 779).

However, the question before the Court is not whether having judges run in partisan primary elections and then stripping them of their party label on the general election ballot is sound policy. The question is whether the Constitution forbids it. The State has broad power to prescribe the manner of elections, and their latitude to do so is circumscribed only by the limits set forth by the Constitution. Accordingly, the Court cannot strike down an election law that

fails to achieve, or even runs contrary to, the State's stated objectives so long as that law does not impinge on anyone's constitutional rights.[3]

In short, because it does not address ballot content, *Carey* does not resolve the issues presented in this case. Although *Carey* did not consider the issue of ballot content, the Sixth Circuit has decided ballot content cases in the past. Plaintiffs rely on one such case, *Rosen v. Brown*, 970 F.2d 169 (6th Cir. 1992), to support their argument that Ohio's judicial candidates have a right to use the ballot to communicate their political affiliation on the general election ballot. In *Rosen*, an Independent candidate for office challenged the constitutionality of Ohio's statute which prohibited nonparty candidates from having "Independent" placed on the general election ballot next to their names but printed "Republican" or "Democrat" next to the names of party candidates. The Sixth Circuit held that the statute was unconstitutional because it violated the First and Fourteenth Amendment rights of Independent candidates to be so designated on Ohio's general election ballots. *Id.* at 178. Supporting the court's holding was evidence produced by the plaintiffs demonstrating that "party identification is the single most important influence on political opinions and voting" and that "the tendency to vote according to party loyalty increases as the voter moves down the ballot to lesser known candidates seeking lesser

---

[3] This is not an isolated conundrum for federal courts. When considering a First Amendment challenge to New York's statutory scheme for electing judges, United States Supreme Court Justice Stevens concurred in the Court's decision upholding the law but felt it "appropriate to emphasize the distinction between constitutionality and wise policy." *New York State Bd. of Elections v. Torres*, 552 U.S. 196, 209 (2008) (Stevens, J., concurring). Justice Stevens observed that the district court's findings described "glaring deficiencies in that system and even len[t] support to the broader proposition that the very practice of electing judges is unwise." *Id.* "But," Justice Stevens continued, "as I recall my esteemed former colleague, Thurgood Marshall, remarking on numerous occasions: 'The Constitution does not prohibit legislatures from enacting stupid laws.'" *Id.*

known offices. . . . Without a designation next to [a candidate's] name on the ballot, the voter has no clue as to what the candidate stands for." *Id.* at 172.

The *Rosen* court concluded, based upon evidence presented, that Ohio infringed upon the right of supporters of Independent candidates to meaningfully vote and associate by providing a "voting cue" to Democratic and Republican candidates but not Independent candidates. *Id.* at 176. The court also found that Ohio's proclaimed interest justifying the statute, preventing voter confusion, was specious, and noted that "'[a] State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism.'" *Id.* at 177 (quoting *Eu v. San Francisco Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 228 (1989)).

Plaintiffs' takeaway from *Rosen* is that a party label is the single most important piece of information a voter should have when casting a ballot and that, by prohibiting the voter from having that information when voting for judicial candidates, Ohio law conflicts with its stated goal of enhancing voter education and fostering informed and educated voting.[4] The principles set forth above support Plaintiffs' conclusion. However, there is another part of *Rosen* that runs contrary to Plaintiffs' position in this case: its finding that the State could eliminate party

---

[4] Plaintiffs bolster this interpretation of *Rosen* by referring to a more recent Sixth Circuit case in which the court stated that "in many cases party affiliation has the same, if not more, importance than the identity of the candidate." *Libertarian Party of Ohio*, 462 F.3d at 592. However, the Circuit Court made that statement in the context of "straight-ticket" voting, which allows an individual to mark one box that automatically selects the candidates from one of the major parties. Also, at issue in *Libertarian Party of Ohio* were laws that impeded ballot access for minor political parties, and the focus of the case was on the associational rights of political parties, not the expressive rights of candidates. Thus, the Sixth Circuit's comment in *Libertarian Party of Ohio* regarding the relative importance of party affiliation *vis a vis* the candidate herself does not facilitate the analysis of whether judicial candidates have a right to use the general election ballot to express their party affiliation and successful nomination.

designations from the ballots altogether. Specifically, *Rosen* found that "[w]ith respect to the political designations of the candidates . . . on the ballot, a State could wash its hands of such business and leave it to the educational efforts of the candidates themselves, or their sponsors, during the campaigns." *Id.* at 175. The State is quick to point this out and claims that *Rosen* supports its decision to place all judicial candidates on the non-partisan section of the general election ballot.

Ultimately, *Rosen* concluded that a state may allow political designations of candidates on the ballot or it can refuse to do so, but "[o]nce a State admits a particular subject to the ballot . . . it must take into account the provisions of the Federal and State constitutions regarding freedom of speech and association, together with the provisions assuring equal protection of the laws." *Id.* Ohio has "admitted the subject" of party affiliation to the ballot with respect to races for most elected offices. However, it does not flow from *Rosen* that Ohio also must permit that subject in judicial races. Judges, simply put, play a different role in government than do members of the legislature or other elected offices. "Judges do not represent constituents. . . . [I]f they represent anything, it is the rule of law, which is why they sometimes must rule *against* the policy preferences of a majority of the voters." *Carey*, 614 F.3d at 193. Accordingly, "[j]udicial elections differ from legislative elections, and [states have] a compelling interest in regulating judicial campaign speech to ensure the reality and appearance of an impartial judiciary." *Id.* at 194. Accordingly, while the Sixth Circuit has not decided the precise issue, its precedent leads this Court to conclude that so long as Ohio treats all judicial candidates equally, it need not treat them in the same manner that it treats candidates for other offices.

This conclusion is bolstered by *Haffey v. Taft*, 803 F. Supp. 121 (S.D. Ohio 1992), decided shortly after *Rosen.* In *Haffey*, an independent judicial candidate filed suit in federal court seeking the invalidation of the same statute challenged in this case, O.R.C. § 3505.04, on First and Fourteenth Amendment grounds. The plaintiff contended that party-affiliated judicial candidates had an unfair advantage over independent judicial candidates such as himself because they were able to declare their party affiliation to the electorate during the primary election, and the State's failure to designate party affiliation on the general election ballot denied him the opportunity to express to the electorate his nonaffiliation. *Id*. at 123. Haffey relied heavily on *Rosen* for its finding that Ohio could not prohibit a nonparty candidate for nonjudicial elective office from having the designation Independent next to his name on the general election ballot. The district court thus considered whether *Rosen*'s reasoning applied to Ohio's *judicial* ballot requirements. It held that it did not. *Id*. at 126. The two cases were distinguishable, according to the *Haffey* court, in part because in *Rosen*, the State had been unable to identify any legitimate interest in treating party-affiliated and independent candidates differently on the general election ballot, whereas the State *did* have an important and legitimate interest in keeping politics out of the judiciary. *Id*. at 125.

Just as the court in *Haffey* distinguished *Rosen*, so must this Court: *Rosen* did not involve judicial elections, and the issue was the different treatment of affiliated and non-affiliated candidates on the same ballot. The Sixth Circuit's later discussion in *Carey* regarding the First Amendment rights of judicial candidates to express their party affiliation does not make *Haffey* any less applicable to this case because *Carey* did not hold that judicial candidates' First Amendment right to expression extended to the ballot.

Taken together, *Carey* and *Rosen* stand for the following: (1) judicial candidates have the right, protected by the First Amendment, to express their party affiliation, and (2) a state's broad power to regulate elections includes the ability to decide whether or not to allow candidates to use the general election ballot as a forum for expressing their party affiliation so long as the permission extends equally to all the candidates. These cases do not stand for the principle that judicial candidates in Ohio have a right under the First Amendment to use the general election ballot to announce the fact they are their nominating parties' standard bearers.

To summarize, Ohio's general election ballot is not a forum for judicial candidates' speech. *Timmons*, 520 U.S. at 363. Therefore, O.R.C. § 3505.04 does not severely burden judicial candidates' First Amendment right to free expression.

### 2. Free Association

Separately, Plaintiffs claim that O.R.C. § 3505.04 burdens the First Amendment associational rights of Ohio's judicial candidates. The First Amendment guarantees the right of individuals to associate for the advancement of political beliefs. *Anderson*, 460 U.S. at 787. "It does not follow, however, that . . . the right to associate for political purposes *through the ballot* [is] absolute." *Burdick*, 504 U.S. at 433 (emphasis added). When a state election law imposes only reasonable, nondiscriminatory restrictions on First Amendment rights, the state's important interest in structuring elections will be sufficient to justify the restriction. *Id*. at 434.

Plaintiffs do not describe how the Ohio law uniquely impacts the associational rights of candidates as distinct from those of voters and political parties. However, as the Supreme Court has recognized, "'the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on

voters.'" *Anderson*, 460 U.S. at 786 (quoting *Bullock v. Carter*, 405 U.S. 134, 143 (1972)). That said, the Court must determine whether the judicial candidates' First Amendment claim that the statute violates their associational rights survives the State's motion for summary judgment.

To determine the magnitude of the burden on associational rights imposed by a state's election laws, "the Supreme Court has looked to the associational rights at issue, including whether alternative means are available to exercise those rights; the effect of the regulations on the voters, the parties and the candidates; evidence of the real impact the restriction has on the process; and the interests of the state relative to the scope of the election." *Libertarian Party of Ohio*, 462 F.3d at 587. Judicial candidates in Ohio have various alternative means to exercise their associational rights despite the ballot restrictions of O.R.C. § 3505.04. The candidates are free to associate for the purpose of advancing their political beliefs by running in partisan primaries, attending political gatherings, participating in fund-raising activities sponsored by political parties, appearing on political parties' sample ballots, and saying that they are a members of or are endorsed by a political party. Ohio Revised Code § 3505.04 does not "limit access to the ballot," *Burdick*, 504 U.S. at 434; rather, it limits the manner in which a candidate appears on the ballot. Plaintiffs have not provided the Court with precedent that holds that judicial candidates have a constitutional right to associate by placing a party identifier by their names on the general election ballot.

In *Rosen*, where a candidate, a voter, and a nonprofit organization challenged the Ohio statute prohibiting the placement of "Independent" below the candidate's name, the Sixth Circuit noted that "[t]he primary concern in any ballot access case is not the interests of the candidate *but of the voters* who support the candidate and the views espoused by the candidate." *Rosen*,

970 F.2d at 175 (emphasis added). Thus, when it held that the Ohio statute was unconstitutional, the Sixth Circuit did so on the grounds that the statute burdened the First Amendment rights "of the *supporters* of Independent candidates," not the candidates themselves. *Id*. at 176.

Likewise, Ohio's prohibition of party identifiers next to the names of judicial candidates implicates the associational rights of the *voter* "to cast meaningful vote for a candidate of [his or her] choice and to meaningfully associate for the advancement of political beliefs." *Id*. at 176. Ohio Revised Code § 3505.04 does not prevent judicial candidates from associating with others for the purpose of advancing their political beliefs, from organizing their campaigns, or from obtaining access to the ballot. Accordingly, the statute constitutes only a minimal restriction on judicial candidates' First Amendment right to associate.

**B.     Voters**

In addition to their argument that O.R.C. § 3505.04 burdens the First Amendment rights of the judicial candidates, Plaintiffs contend that the statute heavily burdens the rights of voters' rights to associate, receive information, and cast meaningful votes at the ballot box. The inclusion of voters (and the Democratic Party) as plaintiffs in this litigation differentiates it from the unsuccessful 1992 legal challenge to this same statute brought by the judicial candidate in *Haffey*. Whether this statute violates the associational rights of voters is thus an issue of first impression.

"The First Amendment protects the right of citizens to associate and to form political parties for the advancement of common political goals and ideas." *Timmons*, 520 U.S. at 357 (citing cases); *Williams v. Rhodes*, 393 U.S. 23, 38 (1968) ("The right 'to engage in association for the advancement of beliefs and ideas' (*NAACP v. State of Ala. ex rel. Patterson*, 357 U.S.

449, 460 (1958)), is one activity of [association] that has First Amendment protection.")
(Douglas, J., concurring). However, election laws "invariably impose some burden upon
individual voters" and affect "the individual's right to vote and his right to associate with others
for political ends." *Burdick*, 504 U.S. at 433. The issue, then, is whether the law unreasonably
interferes with the right of voters to associate.

Voters in Ohio have a variety of means to associate for the advancement of common
political goals, and Plaintiffs do not argue otherwise. Their contention is that the State's
elimination of party identifiers from the slate of judicial candidates on the general election ballot
prevents voters from receiving information that would allow them to associate with their party at
the "climactic moment of choice."

Plaintiffs rely on *Eu v. San Francisco County Democratic Central Committee*, 489 U.S.
214 (1989), in which the Supreme Court found that California's ban on primary endorsements by
political parties violated the First Amendment in part because it "ham[strung] voters seeking to
inform themselves about the candidates." *Id*. at 223. However, the California prohibition was
vastly different in scope than the law challenged here. In California, the ban prevented political
parties from stating whether a candidate adhered to the party's tenets or whether party officials
believed the candidate was qualified for the position sought. There is no such prohibition here,
and voters in Ohio have abundant opportunity to learn which candidates are endorsed by the
political party with which they identify.

So how much of a burden is it on voters' rights that the State does not permit a party
label on the general election ballot to aid them in selecting judicial candidates that will advance
their beliefs and ideas? To be sure, voters may associate with their preferred party in any

number of ways outside the voting booth, as "individuals play[] a broad spectrum of roles in [an] organization's activities." *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 215 (1986). However, some individuals choose to "limit their participation to casting their votes for some or all of the Party's candidates" (*id.*), and the general election ballot is the operative document for the "most crucial stage in the electoral process" (*Anderson v. Martin*, 375 U.S. 399, 402 (1964)). Further, the unrebutted evidence submitted at the injunction hearing demonstrated that substantially fewer voters cast votes in nonpartisan races as compared to partisan races. Thus, to the extent voters fail to cast a vote for a judicial candidate because the candidate lacks a partisan cue, those voters are not exercising their associational right whatsoever at that climactic moment of choice.

To assess the extent of the burden, the Court must refer to the factors discussed by the Sixth Circuit: whether alternative means are available to exercise those rights; the effect of the regulations on the voters; and evidence of the real impact the restriction has on the process. *Libertarian Party of Ohio*, 462 F.3d at 587. Clearly, the real impact of the restriction on voters and the process of voting is that many individuals simply do not vote for a candidate lacking a partisan identifier. However, as this Court stated in its Order denying Plaintiffs' Motion for a Preliminary Injunction, a nonpartisan ballot "does not deny a voter information needed to follow a particular candidate from the primary to the general election." Doc. 49 at Page ID 800.

Just as the record demonstrated that there is voter drop off in nonpartisan races, it also demonstrated that information about a judicial candidate's partisan affiliation is widely available to voters. Supreme Court jurisprudence "reflect[s] a greater faith in the ability of individual voters to inform themselves about campaign issues." *Anderson*, 460 U.S. at 797 (observing that

[i]n the modern world it is somewhat unrealistic to suggest that it takes more than seven months to inform the electorate about the qualifications of a particular candidate simply because he lacks a partisan label"). In sum, although it is a close call, the Court finds that because there are a means by which voters can meaningfully exercise their associational rights despite the ballot restrictions set forth by O.R.C. § 3505.04, Plaintiffs have not demonstrated that the statute severely burdens voters' associational rights protected by the First Amendment.

### C.     The Party

The Democratic Party argues that O.R.C. § 3505.04 imposes a "severe" burden on its right of association because it dilutes the Party's message that certain judicial candidates are its standard bearers. It states that voter drop off—that is, the phenomenon of voters failing to cast votes in nonpartisan judicial elections—is the resulting demonstrable harm.

"[P]olitical parties' government, structure, and activities enjoy constitutional protection." *Timmons*, 520 U.S. at 357 (citing *Eu*, 489 U.S. at 230). In particular, a party's "attempt to broaden the base of public participation in and support for its activities is conduct undeniably central to the exercise of the right of association." *Tashjian*, 479 U.S. at 214. However, a voting regulation that has the effect of diluting a political party's message has not been found to constitute a "severe" restriction on the party's associational rights. As the Sixth Circuit observed, "[r]estrictions that do not affect a political party's ability to perform its primary functions—organizing and developing, recruiting supporters, choosing a candidate, and voting for that candidate in a general election—have not been held to impose a severe burden." *Libertarian Party of Ohio*, 462 F.3d at 587. For example, while a political party has a right to select its own candidate or standard bearer, "[i]t does not follow . . . that a party is absolutely

21

entitled to have its nominee appear on the ballot as that party's candidate." *Timmons*, 520 U.S. at 359. "That a particular individual may not appear on the ballot as a particular party's candidate does not severely burden that party's associational rights." *Id*.

The Supreme Court's decision in *Timmons* is particularly relevant to the question presented in this case because it concerned whether a political party could place its identifier next to its preferred candidate's name on the ballot. In holding that Minnesota's antifusion laws did not violate the New Party's associational rights, the Court in *Timmons* examined the scope of the associational rights afforded to political parties by the First Amendment. The challenged statute prohibited an individual from appearing on the ballot as the candidate of more than one party. The New Party argued that the fusion ban burdened its right "to communicate its choice of nominees on the ballot on terms equal to those offered other parties" and insisted that "communication on the ballot of a party's candidate choice [was] a 'critical source of information for the great majority of voters . . . who . . . rely upon party labels as a voting guide.'" *Id*. at 362 (quoting Brief for Respondent). The Supreme Court was not persuaded and rejected the Party's contention that it had a right to use "the ballot itself" to send a particularized message. *Id*.[5] Despite the ballot restriction, Minnesota did not directly preclude political parties

_____

[5] The refusal by the Supreme Court in *Timmons* to recognize a political party's right to associate by identifying its preferred candidate on the ballot arguably was a reining in of political parties' associational rights. In *Tashjian*, 479 U.S. 208, decided in 1986, the Supreme Court took the side of the Republican Party in concluding that Connecticut's closed primary statute impermissibly interfered with the Party's First Amendment right to freedom of association because it prohibited independent voters from casting a ballot in the Republican primary election. In language broadly supportive of the Party's rights, the Court rejected the statute on grounds that it placed "limits upon the group of registered voters whom the Party may invite to participate in the 'basic function' of selecting the Party's candidates." *Id*. at 215–16. That the limitation was imposed "at the ballot box"—an area in which states are granted "broad power to prescribe the 'Times, Places and Manner of holding Elections," did not alter the Court's conclusion in favor of the Party. *Id*. at 217. The fact that the statute imposed the limitation on

from developing and organizing or from participating in the election process: political parties were still free to endorse candidates, ally themselves with others, nominate candidates for office, and spread their message. *Id*. at 361. Because the challenged law did not prevent the party from engaging in any of that associative conduct, the Court concluded it did not constitute a severe burden on the party's associational rights. *Id*. at 363.

The similarities between the plaintiff's failed argument in *Timmons* and the Plaintiffs' argument here are too great to permit a different result. Ohio Revised Code § 3505.04 does not interfere with the associational rights that *Timmons* found attach to a political party, which include the right to develop and organize (*Tashjian*, 479 U.S. at 214; *Timmons*, 520 U.S. at 361), the right to select its nominees or "standard bearers" (*California Democratic Party v. Jones*, 530

---

primary election day seemed to make it all the more offensive to the Party's associational rights, as the state was thus limiting "the Party's associational opportunities *at the crucial juncture* at which the appeal to common principles may be translated into concerted action, and hence to political power in the community." *Id*. at 216 (emphasis added).

The *Tashjian* Court made certain statements that seemingly could have supported a conclusion in *Timmons* that Minnesota's prohibition on allowing the New Party to communicate its choice of nominees on the ballot violated that party's associational rights. For example, the *Timmons* Court stated that "[t]o the extent that party labels provide a shorthand designation of the views of party candidates on matters of public concern, the identification of candidates with particular parties plays a role in the process by which voters inform themselves for the exercise of the franchise." *Timmons*, 479 U.S. at 220. Additionally, the Court reiterated its early statement in *Anderson* that "'[a] State's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism.'" *Id*. at 221 (quoting *Anderson*, 460 U.S. at 798). Nonetheless, eleven years after it decided *Tashjian*, the Supreme Court (which by that time included six different justices) upheld Minnesota's statute that prohibited the New Party from using the ballot to communicate to voters its choice of a candidate.

Accordingly, although certain statements in *Tashjian* support the Plaintiffs' arguments in this case that O.R.C. § 3505.04 severely burdens political parties' right to associational opportunities "at the critical juncture" when the party's principles could be turned into action—in this case, at the general election—the Supreme Court's more recent decision in *Timmons* compels the conclusion that O.R.C. § 3505.04 should not be considered a severe restriction on the Democratic Party's associational rights under the First Amendment.

U.S. 567 (2000)), and the right to endorse political candidates (*Eu*, 489 U.S. 214). Nor does the statute affect Plaintiffs' right "to spread [their] message to all who will listen. *Timmons*, 520 U.S. at 361. The precedent of *Timmons* directs this Court to conclude that O.R.C. § 3505.04 does not severely burden the Democratic Party's associational rights under the First Amendment.

Plaintiffs in this case seize upon the fact that Ohio law permits political parties to select their standard bearers for vacancies on state court benches in the primary elections, but it then "strips" the party label from that standard bearer on the general election ballot. Indeed, this midstream change of tack is uniquely limited to judicial candidates: the names of legislative and executive branch candidates are listed by political party on both the primary and general election ballots. According to Plaintiffs, it burdens the Party's associational rights to have its standard bearer stripped of the party label on the general election ballot. To support this argument, Plaintiffs cite *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008).[6] In particular, Plaintiffs rely on Chief Justice Roberts's concurring opinion in which he states that if the state's ballot "merely lists the candidate's preferred parties next to the candidate's names, or otherwise fails clearly to convey that the parties and the candidates are not necessarily associated, the [voter initiative] would not survive a First Amendment challenge." *Id*. at 461. The Chief Justice was referring to the fact that to avoid infringing on the political

---

[6] In *Washington State Grange*, the Supreme Court considered a constitutional challenge to a voter initiative which provided that candidates be identified on the primary ballot by their self-designated party preference and that the two top votegetters, regardless of party preference, advance to the general election. Political parties claimed that the initiative violated their associational rights by usurping its right to nominate its own candidates and by forcing it to associate with candidates it did not endorse. The Court concluded that the initiative did not impose a severe burden on the political parties' associational rights, and the state's interest in providing voters with relevant information about the candidate on the ballot was sufficient to sustain the provision. 552 U.S. at 444.

party's associational right to choose its own candidate, the ballot needed to be printed in a way that made clear the party listed alongside the candidate's name was strictly the candidate's "preferred" party and not that the party endorsed that candidate. Plaintiffs assert that this analysis leads to the conclusion that "a general election ballot that suggests no party affiliation—when the system for achieving a spot on the ballot was a state sponsored partisan primary election—violates the First Amendment associational rights of the party because it improperly suggests that the party is unconnected to the candidates." Doc. 65-1 at Page ID 921.

Plaintiffs' argument, which is the inverse of that made by the Chief Justice, is not persuasive. The issue in *Washington State Grange* was the political parties' concern that voters would mistakenly conclude that candidates on the general election ballot were their preferred nominees—a situation occasioned by the fact that under the challenged initiative, candidates were identified on the ballot by their self-designated "party preference." In concluding that the initiative did not violate the First Amendment, the Court reaffirmed "the special place the First Amendment reserves for, and the special protection it accords, the process by which a political party 'select[s] a standard bearer who best represents the party's ideologies and preferences.'" *Washington State Grange*, 552 U.S. at 453 (quoting *California Democratic Party*, 530 U.S. at 575). However, it concluded that the challenged law did not infringe upon the parties' right to choose its nominees. Under the law, parties were free to nominate their own candidates outside the state-run primary; they simply could not indicate their nominees *on the ballot*. *Id*. The Supreme Court left no room for debate on the matter, expressly stating: "The First Amendment does not give political parties a right to have their nominees designated as such on the ballot." *Id*. at 453 n.7 (citing *Timmons*, 520 U.S. at 362–63 ("We are unpersuaded, however, by the

party's contention that it has a right to use the ballot itself to send a particularized message, to its candidate and to the voters, about the nature of its support for the candidate.").

Plaintiffs urge this Court to come to a different conclusion, noting that the Sixth Circuit has said that "in many cases, party affiliation has the same, if not more, importance than the identity of the candidate." *Libertarian Party of Ohio*, 462 F.3d at 592. If a candidate's party affiliation is more important to voters than the identity of the candidate, is it not a crucial piece of information to put on the general election ballot? And does the absence of that identifier not entirely frustrate the political party's efforts to engage voters in participating in the judicial election? Unfortunately for Plaintiffs, the case law does not provide for such conclusions. In *Libertarian Party of Ohio*, the Sixth Circuit struck down an Ohio law that required all minor political parties to file a petition with the Secretary of State 120 days in advance of the primary election, finding that it imposed an unconstitutional burden on the parties' association rights by preventing it from gaining access to the general election ballot in the twelve months preceding a presidential election. *Id.* at 582.[7] Thus, the issue was not whether the statute affected the rights of the party to select a certain candidate to be its standard bearer but the "far more important function of a political party—its ability to appear on the general election ballot." *Id*. at 588.

The Ohio statute challenged by Plaintiffs in this case does not interfere with the Democratic Party's right to nominate its preferred candidates for judge or the Party's right to get its candidate on the ballot: the Democratic Party's nominee and standard bearer takes his or her place on the judicial slate alongside other party candidates and independents. Rather, the statute

---

[7] Because of the date of the primary election, minor parties like the Libertarian Party were required to submit a petition no later than November 3, 2003 to appear on the ballot for the November 2, 2004 general election.

prohibits the Party from using the general election ballot as a mechanism for communicating that it has chosen that individual as its nominee. *Washington State Grange* is clear that the First Amendment does not confer upon political parties the right to use the ballot as a means to communicate the message that a certain candidate is its standard bearer. *See* 552 U.S. at 453 n.7. Accordingly, as in *Washington State Grange*, the challenged statute does not severely burden the Party's associational interests.

### D.     The State's Interest

Because the burden § 3505.04 places on Plaintiffs' First Amendment rights is not severe, the burden is justified if the statute serves an important regulatory interest of the State. The State claims only one interest at stake: that of "minimizing partisanship in judicial elections." (Doc. 59 at Page ID 880.) The distinction between the roles of the judiciary and other branches of government have been used to support the different treatment of these elected officials in Ohio for more than a century. For example, when upholding the law requiring judges to run on a nonpartisan ballot, the Ohio Supreme Court described how a judge had to distance himself from partisan politics to fulfill his duties:

> Legislative and executive officers are selected for the avowed purpose of promulgating definite principles and methods of government advanced by the[ir] respective parties. . . .  No partisan political platform can be written for the judge.  He is charged with the interpretation and the administration of the law as he finds it.  He has no voice in framing it.  He must not depart from the plain provisions thereof, no matter how much he may be opposed to the principles or purposes of it.  In the discharge of his duty a judge is not concerned with party platforms or party expediency.  In his official capacity he can serve no party, promulgate no partisan theories of government, encourage no partisan economic measures.

*Weinberger*, 99 N.E. at 1085.     It is difficult to imagine that a judge, or voter for that matter, would quibble with the *Weinberger* court's description of a judge's obligation to remain apolitical in the discharge of his duties. However, it also is unrealistic to believe that a judge can entirely set aside his political philosophy when making decisions.

In fact, the Sixth Circuit expressly recognized in *Newman v. Voinovich*, 986 F.2d 159 (6th Cir. 1993) "that judges are policymakers because their political beliefs influence and dictate their decisions on important jurisprudential matters." *Id*. at 163 (holding that Ohio's governor was "free to make judicial appointments based on political considerations"). In a concurring opinion, Judge Nathaniel Jones agreed and observed that "persons elevated to the bench do not leave their ideals, life experiences, and political philosophies behind." *Id*. at 165. Judge Jones went on to say:

> Any person charged with the appointment of a member of the judiciary should be aware of those factors which may suggest how a person may treat an issue. That person should not be prevented from choosing a prospective judge based on that prospective judge's general views on the implementation and interpretation of the law. In Ohio, it is the governor who is charged by the Ohio Constitution with appointing interim judges, see Ohio Const. art. IV, § 13. Therefore, a governor should be free to choose persons who share (or do not share) his/her general philosophy on the implementation and interpretation of the law.
>
> In determining a prospective judge's general philosophy, a governor should be able to look at various aspects of that person's life. Undoubtedly, there are an infinite number of ways to determine a judge's general philosophy. Party affiliation may provide some insight to the types of philosophies a prospective judge maintains. As a result, I absolutely agree with Judge Keith that political affiliation may be *an appropriate factor* to consider when making interim judicial appointments.

*Id*. (emphasis in original).

The reasoning the Sixth Circuit employed in *Newman* to conclude that party affiliation is an appropriate factor for consideration in the Governor's appointment of interim judges surely applies with just as much force to the election of judges by Ohio's citizens: when electing a judge, shouldn't the electorate be provided with the type of information the Governor requires when making a judicial appointment?

The State asserts that Ohio voters do have that information available to them. Voters may receive in the mail "sample ballots" from political parties that include judicial candidates or campaign materials which indicate the candidates' party affiliation. Further, voters can conduct their own investigation by looking at their county's political party website or their county's board of elections website, either of which may indicate judicial candidates' party affiliation.

The fact that the State is quick to point out the variety of means available for voters to learn which judicial candidates are Republicans and which are Democrats make it difficult to accept Ohio's articulated interest in "minimizing partisanship in judicial elections." Furthermore, if the State truly wanted to minimize partisanship in judicial elections, it is unlikely that it would afford political parties such a prominent role in selecting judges: the parties both nominate the judicial candidates in partisan primaries and then openly endorse those candidates prior to the general election. In other words, Ohio steeps the judicial selection process in partisan politics everywhere *but* in the voting booth on election day.

We know from *Carey* that the Sixth Circuit believes that "[j]udicial elections differ from legislative elections." *Carey*, 614 F.3d at 194. However, when it made that statement, the court was considering Kentucky's judicial election scheme, not Ohio's. Kentucky conducts entirely nonpartisan judicial elections, and thus it has a "compelling interest" in "diminishing reliance on

political parties in judicial selection." *Id.* at 194.[8]  Does the fact that Ohio conducts partisan judicial primaries make its interest in "diminishing reliance on political parties in judicial selection" something less than compelling?

The answer is yes.  Ohio's efforts in diminishing reliance on political parties in judicial elections is half-hearted at best, thus its interest in the matter cannot be said to be "compelling." However, the Court has established that the burden that O.R.C. § 3505.04 places on Plaintiffs' expressive and associational rights is not severe.  Accordingly, under *Anderson* and *Burdick*, "the State need not establish a compelling interest to tip the constitutional scales in its direction." *Burdick*, 504 U.S. at 439.  Rather, the State's interest in keeping the political affiliation of

_____

[8]  Though supportive of the right of judicial candidates to express their party affiliation, *Carey* levied criticism at the process of selecting judges through elections—a criticism that is not isolated or unique.  Jurists and scholars alike have expressed the concern that electing judges runs contrary to the interests of the appearance and reality of an impartial judiciary and fails to achieve the goal of having an informed and participatory electorate.  *See, e.g.*, *New York State Bd. of Elections*, 552 U.S. at 212 (Stevens, J., concurring) ("The rule of law . . . presupposes a functioning judiciary respected for its independence, its professional attainments, and the absolute probity of its judges.  And it may seem difficult to reconcile these aspiration with elections."); *White*, 536 U.S. at 788–792 (O'Connor, J., concurring) (discussing her concerns about judicial elections and observing, inter alia, that "the very practice of electing judges undermines" a state's "compelling governmental interest in an actual and perceived . . . impartial judiciary"); Maureen O'Connor, *A Proposal for Strengthening Judicial Elections* (May 2013), *available at* http://ohiocourts2013.org/ (identifying and proposing solutions to a triad of problems presented by Ohio's system of electing judges); Joseph D. Russo et al., *A Legal, Political, and Ethical Analysis of Judicial Selection in Ohio: A Proposal for Reform*, 38 Cap. U. L. Rev. 825, 850 (2010) (opining, "[i]t is imperative that Ohio consider reforming its judiciary processes by making meaningful changes, which will restore public accountability and eliminate the appearance of impropriety"); and Michael E. Solomine, *The False Promise of Judicial Elections in Ohio*, 30 Cap. U. L. Rev. 559, 563, 581 (2002) (discussing evidence demonstrating that most Ohio voters are "vastly uninformed about judicial campaigns" and that "substantial numbers of voters simply skip judicial contests").

This Court finds these many critiques compelling and concludes that Ohio's framework for electing judges fails to accomplish the State's codified goals of "providing the electorate with an understandable ballot, and enhancing voter education, thus fostering informed and educated expressions of the popular will in a general election."  O.R.C. § 3513.257.

judicial candidates off the general election ballot need only be "legitimate" (*id*. at 440) and "reasonable" (*Timmons*, 520 U.S. at 367) to outweigh Plaintiffs' interest in having party affiliation information on the ballot.

The fact that Ohio is the only state that has judicial candidates run in partisan primaries but then strips them of their party identity on the general election ballot puts it in the unique position of having to come up with an explanation as to why such a system is necessary. *See*, *e.g.*, *Eu*, 489 U.S. at 225 (striking down California's ban on primary endorsements after observing, "[n]or does the State explain what makes the California system so peculiar that it is virtually the only State that has determined that such a ban is necessary"). Ohio's only explanation is that it confronts two competing interests in its judicial elections: "its 'compelling' interest in reducing voters' reliance on political parties in judicial selection" and "its desire to secure a formal role for the 'healthy two-party system' in the nomination process." (Doc. 59 at Page ID 881 (citing *Carey*, 614 F.3d at 201 and *Timmons*, 520 U.S. at 367).) These "competing interests" are not unique to Ohio. To the contrary, twenty-two states elect their judges in competitive elections: seven hold overtly partisan elections with the candidate's party affiliation appearing on the ballot in both the primary and general election, and fourteen have explicitly nonpartisan elections. Maureen O'Connor, *A Proposal for Strengthening Judicial Elections* 16 (May 2013), *available at* http://ohiocourts2013.org. Again, Ohio is the only state "that holds overtly partisan primaries with ostensibly nonpartisan general elections with the party affiliation not appearing on the ballot." *Id*.

To the extent that Ohio has a legitimate interest in diminishing party influence over judicial elections, stripping partisan labels from judges' names on the general election ballot is a step in the right direction, because

> partisan elections make party affiliation the single most salient feature of a judge's candidacy by including it as the only information about the candidates on the ballot itself. . . . The net effect is to blur, if not obliterate, the distinction between judges and other elected officials in the public's mind by *conveying the impression that the decision making of judges, like that of legislators and governors, is driven by allegiance to the party, rather than to law.*

*Id*. at 17 (quoting American Bar Association Comm'n on the 21st Century Judiciary, *Justice in Jeopardy* (Chicago: American Bar Ass'n, 2003), 76–77. Judicial elections differ from legislative elections in the fact that judges must be unbiased both in fact and in appearance. State action that serves to preserve the fact and appearance of judicial neutrality, therefore, is plainly legitimate. However, the brazen injection of politics into judicial primaries very nearly eviscerates any benefit served by nonpartisan general elections.

There is abundant room for debate on whether judicial elections should be partisan or nonpartisan, and one's opinion on the matter likely turns on which of the competing interests carries more weight: open disclosure of the inevitable partisan influence in judicial elections, or preservation of the distinct role of the judge as an unbiased arbiter that "serves no party." Ohio's Solomonic approach serves neither interest particularly well.

That said, this Court must conclude that the State's interest in diminishing reliance on political parties in judicial selection is a legitimate one and that it outweighs Plaintiffs' interest in using the general election ballot as a forum for its expressive and associative activities. As the Sixth Circuit explained, "the legitimacy of the judiciary rests on . . . furthering the public's trust

in the integrity of its judges." *Carey*, 614 F.3d at 204. Distinguishing judges from candidates running for political office on the general election ballot is a legitimate and reasonable way of advancing the goal of preserving the public's trust that the judge will abide by the rule of law and not partisan influence.[9] Accordingly, the State is entitled to summary judgment on Plaintiffs' claim that O.R.C. § 3505.04 unconstitutionally burdens the First Amendment association rights of judicial candidates, voters, and the Democratic Party.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Ohio Attorney General's Motion for Summary Judgment (Doc. 59). Granting the Motion resolves all pending issues as to all remaining parties and therefore closes this case.

IT IS SO ORDERED.

          s/Susan J. Dlott
          Chief Judge Susan J. Dlott
          United States District Court

---

[9] Unfortunately, "the very practice of electing judges undermines this interest [in an actual and perceived impartial judiciary]." *White*, 536 U.S. at 788 (O'Connor, J., concurring). However, prior attempts to reform judicial selection in Ohio by doing away with competitive contests have failed. *See Strengthening Judicial Elections* at 2–4.